**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Criminal Action |
| ) | No. 07-03056-01-CR-S-RED |
| MAJED S. NASSAR, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

Pursuant to 28 U.S.C. § 636(b), the above-styled criminal action was referred to the undersigned for preliminary review. This matter comes before the Court on defendant's Motion to Suppress Evidence. A hearing was held before the undersigned on August 15, 2007. Defendant was represented by Donald R. Cooley, and the government was represented by Gary K. Milligan, Assistant United States Attorney.

Defendant moves the Court to suppress evidence seized from his vehicle. Defendant contends that the officer detained him beyond the scope of his authority and without reasonable suspicion or probable cause. He asserts that the officer obtained consent to search only after the unlawful detention, and that the consent was therefore not voluntary.

The government asserts that the stop of defendant's vehicle was valid under the Fourth Amendment, because he failed to signal when exiting the highway, which was a violation of state traffic law. This, it is contended, provided the officer with probable cause to stop the driver. Additionally, the government maintains that defendant voluntarily consented to the search.

1

The first witness for the government was Matt Funderburk, a Missouri State Highway Patrol Officer. He testified that he is one of the supervisors for Interstate 44, and the coordinator for marijuana eradication for Troop "D." Over 80% of his arrest cases over 18 years have involved marijuana. On April 21, 2007, he stopped defendant's vehicle because he made a lane change from I-44 to Route 266, and failed to signal. The officer approached the vehicle, and explained to the driver why he stopped him. Defendant provided his driver's license and registration, and a bill of sale for the car, which had temporary Arizona plates on it. The car had been purchased on April 19. Once the officer had made contact with defendant, he asked him to come back to the patrol car with him. He ran defendant's driver's license, looked at his paperwork, and began to issue a warning for the traffic stop. He also asked where he was headed and asked him about the vehicle he had just purchased. Defendant stated he was going to Chicago to visit his cousin for a few days. He said he'd taken the exit because he was tired, as he had slept in his car the night before. Defendant appeared nervous. His hands were visibly shaking, and he would not make eye contact with the officer at any point in their conversation. Based on Officer Funderburk's experience, it's not entirely unusual for a person to initially demonstrate nervousness, but defendant remained nervous throughout the traffic stop, which the officer thought was suspicious. He was still nervous during the time the officer was talking to him. Officer Funderburk also noticed two cell phones on the console, several fast food wrappers, a blanket, and the strong smell of dryer sheets emanating from the vehicle. The smell was strong enough that he could smell it outside the vehicle, as he was standing by the open window. It was as potent as what a person would experience when opening a box of laundry sheets. Based on his experience, laundry sheets are commonly used to mask the odor of narcotics. Additionally, based on his training, I-44 is a known drug pipeline for drugs

coming from southwestern states to eastern states. Arizona is a big source state for narcotics, and Chicago is a common destination point.

In terms of processing the warning, the officer ran a record's check on defendant's driver's license, and then began entering information into the computer. He didn't recall if he told defendant that he was issuing him a warning. At some point, the officer asked defendant for consent to search the vehicle. This was before he had completely entered the warning information into the computer, but after the records' check had come back. While he was still processing the warning, defendant was not free to leave. When he asked for consent to search the vehicle, defendant just said, "sure." [Tr. 11]. Defendant did not say anything else, and did not ask any questions. Once he'd consented, the officer then asked him to open the trunk, because he hadn't noticed anything suspicious in the vehicle, other than the odor. Specifically, he didn't see anything in the interior of the car that he believed would have contained narcotics, even though the cell phones, wrappers, and blanket made him suspicious. In the trunk, he saw two large duffel bags, two large black trash bags, and dryer sheets scattered around the trunk. The marijuana was inside the two trash bags.

On cross examination, the officer testified that he was stationary in the crossover, running radar checks close to Route 266. He was about a quarter of a mile from 266, on the crossover. Defendant's vehicle was first observed traveling eastbound, and the officer was facing that direction. As far as he recalls, defendant was not exceeding the speed limit or otherwise committing a traffic violation when he went by him. Right after he passed where Officer Funderburk was stationed, he saw the temporary plates, which the officer couldn't make out. Therefore, he pulled out behind him on I-44. Officer Funderburk testified that his intention was to check the expiration date on the temporary plate. Defendant was in the right hand lane of traffic when he pulled in behind him. By

3

the time the officer was close enough to him to see the plates, defendant drove onto the access ramp to Route 266 without signaling. When he noticed that he didn't signal, the officer went ahead and stopped him. He was probably about five car lengths behind him on the interstate. He agreed that there was nothing about the way that defendant turned off that created any danger for other vehicles. When he took the exit, the only reason he stopped him was because he did not signal. When he first activated his lights and stopped him, he intended to issue him a warning for that violation, not a ticket. He did issue him a warning, which was lodged in the computer. To create a warning, he enters the time of the stop, the location, driver and vehicle information, and the violation into the computer. If a search or arrest occurs, that is also entered in. To complete a warning might take from five to ten minutes. The paperwork and driver's license were given to the officer before defendant got out of the vehicle. He was able to verify the purchase of the vehicle just a few days before, and confirm that defendant had a valid driver's license. This took a few minutes. Once defendant provided the license, registration, and bill of sale, he entered all of this into the computer. He was also asking defendant questions at the same time. The officer admitted that, even though he had the information about his name and the vehicle, he did not immediately put it into the computer, but rather, he asked defendant where he was going, and he asked for permission to search his vehicle. This was after he got the information necessary for the warning, and prior to the time he put the information into the computer. When he actually put his name into the computer for the warning was probably later on at the office. At the site, he only recalled putting in the date, time, and location of the stop. He had all the information he needed for the warning, but he had made other observations that he wanted to explore. Some of the conversation was necessary to complete the traffic stop, and some was based on his suspicions.

4

On redirect examination, Officer Funderburk stated that he basically only asked defendant where he was headed. Defendant volunteered the information about being tired and why he took that exit. He did not believe that he asked if he had anything in the car or anything related to narcotics. A question about a driver's destination is a typical question he would ask of people on the interstate during casual conversation. The time that elapsed before he asked for consent to search was no less than five minutes. He did not have to run a records' check to issue the warning, but it's routine to do so.

On recross examination, the officer testified that at the time he asked for consent to search, he had not returned the documents to defendant, nor had he indicated that he was going to do so. It was also acknowledged that he had not told him he was free to leave, and he wasn't free to leave. He did not indicate what he wanted to search for, and did not tell defendant that he had a right to refuse. Officer Funderburk stated that he did have written consent forms with him, but he didn't have defendant fill it out.

The law is clear that once a valid traffic stop occurs, the investigating officer is only entitled to conduct an investigation reasonably related in scope to the circumstances that justified the initial stop. Terry v. Ohio, 392 U.S. 1 (1968); United States v. Cummins, 920 F.2d 498, 502 (8th Cir. 1990). Law enforcement officers are entitled to stop and briefly detain an individual for investigative purposes if there is reasonable suspicion that criminal activity may be afoot. United States v. Hill, 91 F.3d 1064, 1069 (8th Cir. 1996). A police officer may also run a computer check to establish whether the vehicle might have been stolen or whether there are outstanding warrants for any passengers in the car. See United States v. McManus, 70 F.3d 990, 993 (8th Cir. 1995); United States v. Johnson, 58 F.3d 356, 357 (8th Cir. 1995). Additionally, if the responses provided

5

give rise to suspicions unrelated to the traffic offense, the officer's inquiry may be broadened. Id., 58 F.3d at 357. This includes asking the driver for his license and registration, requesting him to sit in the patrol car, and inquiring as to the driver's destination and purpose. Id.; United States v. Brown, 345 F.3d 574, 578 (8th Cir. 2003). If a defendant is detained incident to a traffic stop, the officer does not need reasonable suspicion to continue the detention until the purpose of the traffic stop has been completed. See United States v. Jones, 269 F.3d 919, 924-25 (8th Cir.2001). Further, the Eighth Circuit has clearly held that, even without reasonable suspicion, if an encounter after a traffic stop's completion is consensual, a law enforcement officer may ask questions unrelated to the traffic stop and request consent to search the vehicle. United States v. Santos-Garcia, 313 F.3d 1073, 1078 (8th Cir. 2002).

Based on the testimony set forth in this case, in which Officer Funderburk credibly testified that he observed defendant exit the interstate and turn onto Route 266 without signally, it is clear that there was probable cause to support the initial traffic stop. Having made the valid stop in this case, the officer was acting within his authority pursuant to Terry in briefly detaining defendant, having him sit in the patrol car, asking him general questions regarding his destination, and running a records' check. In this case, the officer testified that he actually only asked defendant about his destination and then asked for consent to search. The question regarding destination was clearly routine, and falls within the scope of a legal Terry stop. The time that elapsed between the stop and the request for consent to search was approximately five minutes, and occurred while the officer was still processing the warning. Therefore, there was no Fourth Amendment violation in this case.

Even if the Court were to conclude, however, that Officer Funderburk's encounter with defendant had exceeded the legal scope of the investigation of the traffic stop, it is clear that the

6

officer had reasonable suspicion to expand the scope of that stop. If a driver's responses and actions result in suspicions of unrelated criminal activity, the scope of a valid traffic stop can be expanded. United States v. Linkous, 285 F.3d 716, 720 (8th Cir. 2002). The evidence should be viewed, moreover, under the totality of the circumstances standard, in light of the officer's experience. Id. at 720.

Officer Funderburk credibly testified that his suspicions were aroused in this case because defendant was unusually nervous; he would not make eye contact throughout their encounter; he was traveling from a known source city for narcotics in a car he'd just purchased two days earlier, and traveling to a known destination for narcotics' trafficking, where he was only going to stay for a few days; he had two cell phones, food wrappers, and a blanket in his vehicle; and he indicated he had slept in his vehicle. The officer also observed the strong smell of dryer sheets emanating from the vehicle, which based on his experience, were commonly used to mask the odor of drugs. Accordingly, the record supports a finding of reasonable suspicion for detaining defendant for a reasonable period of time and for requesting permission to search his vehicle. When considering the totality of the circumstances, the Court finds that the officer's testimony established reasonable suspicion to justify the brief detention and request for consent to search the vehicle.

Further, when Officer Funderburk requested defendant's consent to search, there was no evidence that he did not voluntarily provide that consent. It appeared that defendant did not have a problem understanding English, nor was any testimony otherwise adduced that would have suggested that defendant did not understand what was being asked. There was no evidence to suggest that the officer acted in any manner that would suggest deceit, duress, or coercion. There was nothing in the evidence to suggest that defendant objected to the search or attempt to withdraw

7

Case 6:07-cr-03056-RED   Document 29   Filed 09/05/07   Page 7 of 8

his consent. Additionally, there was nothing about the time that elapsed that would support defendant's contention that the detention was so lengthy as to have violated his Fourth Amendment rights.

Based on a full review of the evidence in this case, the Court finds that the officer acted within his legal authority; that the traffic stop and questioning were constitutionally valid; that the officer had reasonable suspicion to request consent to search; and that the search was consensual. Therefore, it is apparent that the Fourth Amendment was not violated. It must be recommended, accordingly, that defendant's motion to suppress evidence be denied.

For the foregoing reasons, it is, pursuant to the governing law and in accordance with Local Rule 72.1 of the United States District Court for the Western District of Missouri,

RECOMMENDED that defendant's motion to suppress evidence should be denied.

/s/ James C. England  
JAMES C. ENGLAND, CHIEF  
United States Magistrate Judge

Date: 9/5/07